Mr. Kanavi. And may it please the court, Stephen Kinnaird for Samsung. Before I begin my argument, I wish to make a clarification with regard to one of the precedents on which we rely, GoPro. Our reply brief discussed GoPro as involving multiple modes of distribution and not distinguishing among them in terms of the inquiry into public accessibility. But this court ultimately rested its public accessibility decision on a single mode, namely the direct distribution of the reference to attendees of a trade show. But I thought you essentially conceded in your reply brief that you're not relying on the actual trade shows for purposes of your argument. I mean, you never cited to those trade shows. You didn't say they were, you know, Torino didn't even predated the actual reference. So I thought it was pretty clear from your reply brief that you had backed away and admitted. We have never taken the position before the board or here that there was a distribution of WD4 at the Torino meeting in July. But even as to the Geneva meeting, you never relied on that below. We're not relying on the Geneva meeting was a few days after the one-year period. We are relying strictly on the email distribution and then accessibility of the website. Okay, can I, I want to talk about the listserv. Yes. You took the position that the listserv was publicly accessible and the board was not impressed with the testimony that you relied upon. But you also have a document that talks about what happens to these materials for purposes for facilitating cross-organizational communication. What does that mean? Right. That you're referring to the joint terms of reference of the standard setting organization. Right. What they established was that all the JCT documents would be publicly accessible to permit cross-organizational communication between the standard setting organizations, the parent groups, VCEG and MPEG, and also their members, which are the representatives of the leading parts of the academy and the industry. But I think just to clarify, Your Honor, I think that the district court, or rather the board, did take issue with some of the factual statements with regard to accessibility. But the essential facts with regard to the email distribution to the listserv are undisputed. There are certain issues about the quantification of the recipients. We're willing to set that aside and just focus on what the board found was undisputed, which is that it went to the 254 attendees of the Torino. So there's an underlying legal premise here. And that is, and I think it's a, at least it's an arguable one within the bounds of our case law, which is that when you are only talking about distribution to those involved in creating the reference, so that the student and the student's advisors, they create a thesis. If just because it's shared among them, and even maybe incidentally, to the librarian, we've said that's not enough, because those are the creators of the reference. And as I understand what the board is contemplating here, is that what we are talking about is simply sharing the very information as it's being prepared among the creators. Now, there might have been a lot of creators, but from a legal perspective, that is the question is, assuming I accept that proposition. So assuming I said, well if all you're doing is sharing it among the creators, and that that wouldn't be enough, that my biggest question is with respect to the listserv. Does that go beyond the creators? I think I would take issue with the characterization of all the attendees of the meeting as creators in the way that you might think of, you know, an academic group just working on itself. We have to understand... I'm not surprised you would take issue with that. What I'm asking you to assume is that I accept that proposition, that that's what was going on. Is your best argument, assuming that predicate, would your best Well, the email is to the listserv, right? I think the second mode of distribution is the document repository website on the JCT, and then there's a third on the on the MPEG. But the listserv and the email are the same. What I would say is that the fact that the email distribution is to a large group, and the key is there is no restriction or expectation of to distribute that and use it freely, and therefore it has entered the public domain. And that's why I think the fact that this is a standard-setting organization is important. This is not an ordinary membership society, and that's why this is not a purely private publication. These are... So your argument is even if the only evidence is disclosure to the Well, that it was able to go beyond that, and therefore it was in the public domain. Because that was the very purpose of this standard organization. So you have here, and this organization are the representatives of the leaders of industry and the academy, and they're setting out to revise the prevailing industry standard. Well, if that's the case, why wouldn't you have presented evidence that, in fact, all of those people shared it with other people? That's not what you offered. This court has never required that. For example, in GoPro, that was a distribution to attendees of a trade show, which was not advertised or open to the public beyond the dealers, and there was no showing that anybody who attended it was actually a person of skill in the yard. But one of the... And, of course, we've had acceleration after that to explain the limits of GoPro, but what GoPro was talking about is that it was completely open to the public, and there was no indication that public wouldn't have had the ability to get that same information or attend the show. And here, I guess the question is, you're just saying that because they are members of the standard setting organization, they're by definition the public. And what I'm the board concluded that that wasn't the case, and that you presented no evidence that there were members that were... That anyone that were not members of that organization would have access to this. Well, Your Honor, I think one looks to the question not of would have access, but whether they could have with the exercise of reasonable diligence. And the fact that this is a standard setting organization, and also that all the major companies are engineers, all the product developers who are in these companies with reasonable diligence could get these documents from their representatives, or they could find them on the website since this is a major industry event when you revise the prevailing standard. The board did ask the could have question as it relates to the website, and found that because it was so difficult to manipulate the and that's a factual finding. So put that aside. So is it your position that at least as it relates to the email and listserv, the board didn't ask the right question? They didn't ask the could have question, they only asked the question of did they actually access? Yeah, they didn't actually ask that question. Instead, they committed a legal error by requiring a showing that the significant portion of those interested and skilled in the art. So they were looking at the attendees. I don't think that they, in that part of their decision, excluded the attendees. They said, you have to show that they're significant part of the art. And that's plainly wrong, because in MIT, there was distribution to only seven. GoPro, there weren't any. But it's not just a pure question of numbers, though, right? I mean, it could be seven, or it could be 207. And they in certain circumstances would be enough. It doesn't necessarily mean that 207 couldn't fail to qualify in the right circumstances. Well, I think, Your Honor, what it is, if you receive the actual document, and there's no restriction of confidentiality, then you are free to disseminate it. And I think that's the essence of MIT, Medtronic, and GoPro. It's the ability to disseminate it, it's in the public domain. But I would also want to take issue with the idea that... Would your proposal be that we remand to the board to ask the right question, the could-have question? I think this court could determine it as a matter of law based on the essential facts, but at a minimum can remand to do the could-have question. But I do want to take issue with Your Honor's premise that every attendee was a creator of the document. That's really not true. I mean, the group as a whole is a creator, but it was Mr. Bross and the ad hoc committee that actually developed the standard. And then it's sent out to all the attendees, and it will be the subject of the forthcoming Geneva conference in which people can debate it and discuss it. So I don't understand any kind of creatorship to be the driving force of this court's case law, but I think it's not present here. These are attendees of the conference. Your theory is that it's irrelevant whether this was a working document or whether it was a final document, because one of the points which is made, this was the working group, a very large working group creating these documents. This was the fourth iteration in circulation, not necessarily the final one, but that because there were so many participants in the working group, it somehow crossed the barrier from some sort of internal research-type document to a public dissemination. Right. It's definitely not an internal research document. There were attendees... Is that significant? I mean, what are we going to do? We've all got the internet now. People who are working together communicate by internet. If someone can find some way of penetrating, we're told it wasn't easy but not impossible to get into these files, that that converts them into a public bar rather than being limited as the participants in their ordinary course of evolution. There was no constriction of these documents to the public. It was the policy of the Standard Organizations and the JCTV that its documents would be public. That's why the website was open to the universe. But it also suggests that the persons who received the documents, the attendees, whether they had anything to do in terms of the actual discussion of the document, they're having input or they're monitoring it, but as the document was created by the ad hoc working group out of the Torino Conference and then distributed to anybody who's on the LISR, which doesn't need to be... That's the difference that I'm really trying to focus on. We're asking that the line be drawn that here it's labeled a working document. There's nothing that I saw to say this is now the final consensus of these 200-odd participants. It's a working... It is not a final consensus. It was the best effort of the working group to take all the revisions that were suggested and to put it into a document and then distribute it. Okay, but nonetheless, that's now a published document at a statutory bar. Right. That's right. That's what you're asking. The board didn't agree with that. And one can see a certain logic, and I suppose both positions, because it is now accessible thanks to the internet. Right. But it's still not a final document. I think the board only disagreed... The sole grounds of which it rejected it was we didn't show that those attendees and the recipients of the LISR were a significant portion of the total art. Would that have made the difference in your position as to whether it is or isn't? I think it's improper. Our primary position would be that the documents were... The distribution even to the 254 attendees would be enough. We would also take issue... I know a lot of boards where we put together structure of a proposal or certification for a particular class of lawyers. We talk about it, we exchange it, but it's never, in my mind, never contemplated that anyone beyond those of us that are putting it together are going to be reading it until it's final. And so I guess what I'm trying to understand is the mere fact that we're still engaging in this working document analysis, that you're saying that doesn't matter if there's a bunch of people doing it. Well, no, I would say... I would presume that in the circumstance of working on a board, trying to come up with a document, that you're not publicizing that document. You're not... And there'd be an expectation of confidentiality until you have a final product. That was not the way of the JCT. The JCT, all documents, including input documents, working drafts, were to be public, placed on their website... So what evidence other than Mr. Bross' testimony that the board found to be speculative and inconclusive, what evidence of the fact that it was... Everybody was able to share it publicly. What evidence did you present to that effect? Well, he did testify. I think he did have personal knowledge, and this would be lack of substantial evidence to say that he had no knowledge of whether others were on the LISTSERV beyond the membership. He testified that they were, but the number, we don't know. He didn't testify to the number. He didn't testify that they were. I thought he testified that it was possible. Well, he testified that you could get access to the LISTSERV, even if you were not a member. He testified if you were clever enough, you could figure it out. No, I think for the LISTSERV, you can just simply... He testified that the request to be added to the LISTSERV was generally granted. Yes, it was a very large working group. That was clear. Well, let's hear from the other side, and we'll save you rebuttal time. Thank you, Ron. Mr. Newman. Good morning, Your Honors. May it please the Court, I will start by admitting that there's no relation between myself, Michael Newman, and the senior judge presiding here today. I've seen your name. I'm glad to see your face. I've seen your name many times. Thank you. The issue here is the fact that we've got a board decision that has controlling findings of fact that compel that Samsung did not meet its burden below. The board set forth, in this situation, it's a very fact-intensive situation where the board set forth 13 pages of findings, including a finding that Samsung presented insufficient evidence to establish that either the email or the document repositories were publicly accessible. Well, what about the fact that Mr. Brosnan did testify that the LISTSERV was open to the public, that if you wanted on, you could get on? I mean... With respect to the LISTSERV, I think that the board found below that that wasn't accessible because it wasn't indexed in any meaningful way. It was indexed by the name of a city that this development... That was the website. Oh, so the LISTSERV. The LISTSERV. I'm sorry if I... What was your question again? Yeah, so put the website aside. I think that under Acceleration Bay, there's a good argument that the website was too problematic, especially in light of their findings. The LISTSERV, Mr. Bros testified that the public could get onto the LISTSERV. All they had to do was ask. Well, the board rejected that testimony as being unsubstantiated and not credible evidence, mere speculation by Mr. Bros. Why is that speculation? Mr. Bros wasn't anyone just off the street. He was intimately involved with the organization, the task force, I guess it was. So, I mean, it strikes me that he was certainly in a position to know what was accessible and how easily it would be accessible at the website. Well, again, the finding below was that the testimony wasn't sufficient to establish that. And that there was deposition testimony, for example, where Mr. Bros sort of just brushed aside. I didn't know who was at the meetings. That wasn't my responsibility, but then juxtaposed to his testimony that, oh, these other people would be doing something. You know, it's just unsupported. This goes back to the wood versus could discussion that I had with your friend on the other side. So, the board, I mean, Bros certainly was qualified to testify that other people could access the listserv. What the board said was that he didn't provide any testimony that they actually did. And isn't that maybe the wrong question? The question has to be, is could, with reasonable diligence, the public gain access to it? Well, no, I don't think so. I certainly don't think it's dispositive. This, there's a number of facts that all need to be considered. And that is exactly what the board did below. Whether or not someone could access this would be certainly maybe a fact, a fact that you would add into that analysis. But it's not dispositive for sure. It shouldn't be a situation where we disturb the factual findings below for some speculative. Well, but shouldn't we at least remand to have the board ask the right question? I don't think it's necessarily a wrong question. By not asking that, that's the wrong question. They asked whether this was publicly accessible. And they found, after looking at the nature of the disclosure, that it was not publicly accessible. And that's ultimately defining the fact that controls here. And I'll point to the Bayer case as being, even the intent that a reference is to be publicly available, even that intent should not be a controlling, should not control. So I would say that even if they went down and found that it could have been, this reference could have been distributed, that's not controlling. Because what we're asking is, was it actually publicly available? What's your response to your friend's argument that there was no confidentiality requirement? So that every single one of the participants, every single one of the attendees, was free to pass it on to anyone else they wanted. And there was no restriction on that. Shouldn't that be a factor that we consider? Or that the board should consider? It should be, honestly. And the board did consider it. It recited that fact. It mentioned that we don't dispute that fact. And then it went through the fact-intensive role that it's supposed to be playing. And it determined that, as a whole, the evidence weighed in favor of finding no public accessibility. And that ruling, there's no reason for this court to reweigh that evidence or to remand for an additional question that we know is not a dispositive question. And at one point, I'd like to mention about whether or not there was a sufficient number of people in the JCTC group to somehow make this rise to a legal determination that if you've got that many people, there's going to be an assumption... At some point, it's hard to keep a lid on things. Well, certainly. I mean, it's hard to keep a lid on what I say to my colleagues sometimes. But there should not be a per se rule of law. This should be something that is left for the courts to decide on a case-by-case basis, which is well established that this is how we make these determinations. And the lower bodies should assess all of those facts. And then, if they make a mistake... And typically, I've reviewed all of the cases that were submitted in the three or four that have come out since. The cases in which we've seen a vacation or remand is when the court considered not enough evidence. But here, we've got their main complaint is that the court considered too much. That they considered they needed a publication or an advertisement. Certainly, in a situation where public accessibility has not been shown as we have here, it is perfectly reasonable for the court to go above and beyond and say, well, since we find that the email wasn't publicly accessible, then we'll look to see maybe they advertised it, but there's no evidence of that either. I mean, has there ever been a case where 250 people had access to information and we said that wasn't public? No, which is a great point. No, and before In re Hall, there had never been a case in which there was a single reference in a German library. This is the fact finder's decision. And what we're looking for is, is it supported by substantial evidence? I don't see that they've even challenged the ruling that the factual determination that this is not publicly accessible. Or certainly not the factual ruling that the evidence is inconclusive or is insufficient. Both of those are factual findings in the Acceleration Bay case. We have a very clear statement that we will not disturb a finding of fact of insufficient evidence. And that's exactly what we have here, is a finding of insufficient evidence. Samsung was in control of all the evidence. Mr. Brose, you would imagine, would be in control of all that evidence. And after, in Patten owner's reply, these problems were brought to the attention of Samsung. They rested on their laurels. They cited back to the institution decision. They didn't bring forth any evidence, which if what they're trying to argue is true, if it was disseminated, you'd imagine Samsung would have an email somehow within their own company that forwarded this draft throughout their company. They brought nothing forward. And the panel, the board below, rightly found that was insubstantial evidence. And I don't think that it's wise to get into an area where we're starting to say, well, when a group of people are drafting and working on a particular document, that that's going to somehow rise to being publicly available where there's, I'm imagining a lot of situations in which we won't want that determination to be made as a matter of law. And we should leave that to the lower courts to weigh on a case-by-case basis. No, it looked to me as if what the board was trying to do was to recognize, there's no question that if there's a group of collaborators working together, communicating privately with each other, even if they're collaborating in the form of producing what here is called a working document, that that document is not in the public domain. But technology has moved us to the point, let's accept, where there may well be access to working documents that was not previously available. Here we have the board trying to preserve, perhaps, the confidentiality of groups of scientists, technologists working together. But perhaps, perhaps we've crossed that bridge, whether by hack or by ingenuity, whatever else, working documents using now what is the standard method of interaction and communication can be penetrated. And if there are large enough numbers involved, those are factors to be considered. Maybe the rules have changed. There's no longer, perhaps, an expectation of confidentiality when you're only in your fourth draft of a document, and that it becomes part of the public domain, and that interested persons can figure out how to find it. Now, so here we have the board saying, no, we don't like that. How long can that last? Yeah, I mean, if we progress to a situation in which groups of individuals can no longer assume that their drafts are going to be, you know, not subject to public review because of hackers or whatever, then we've moved into a strange place. Indeed, I don't think the law contemplates that at the moment. I will mention a fact that the membership themselves, the JCTVC, they didn't consider themselves to be part of the public. Neither did the MPEG community. In fact, they recognized exceptions on, and this is Appendix 4629, they recognized exceptions in which a document could be treated confidentially. And still distributed to the entire membership of both of those development teams. And therefore, you know, I think that because they don't, because these two bodies didn't consider themselves to be the public, there's a perfectly reasonable fact finding below that they weren't the public. But you're saying they recognize exceptions, but in those circumstances, they said that they would be designated as confidential and there would be, and it would be, the access would be limited to those with password protection. But that didn't happen here, did it? There's no evidence that that occurred here. Right, there's no evidence that there was any password on working draft four. That's something, but the only evidence is that only this membership received the working draft. If this membership considers itself to be outside of the public for the purposes of password control, then it's perfectly reasonable for the board to consider these bodies to be outside of the public for the purpose of the dissemination of the drafts that they're working on. Any more questions? Okay, thank you, Mr. Newman. Thank you. Can I just want to make a couple of quick references to what was actually the evidence on appendix 5327, which is the Torino meeting. They talk about that the document distribution was used for this website, was used for all documents. And the reference he referred to at 4629 in terms of reference establishes as the presumption of public documents. As far as Mr. Bross's testimony, that is the, he said 7947, based on my knowledge and recollection, the JCTVC reflector includes as its members, the participants, and interested individuals. He would know that as the man who is responsible for the documents, responsible for uploading them, and responsible for sending, at least with regard to Torino, to the listeners. You're, what you're debating is whether or not their fact finding was supported, right? On that particular point, but I really do want to go back to this issue of whether you can analogize these to creative research collaborators. This is all of industry getting together to hash out a standard. It's going to be contentious. These are competitors. Are you saying the minute standard setting organizations start to talk, it's public? Well, what is public is that they have the, the meeting was restricted to the participants who had to be qualified and invitees, right? Because it's a working group, right? But the document was free to be disseminated. They wanted public comment because you need all of industry to eventually agree to this standard. And so the devices can talk to each other. And that's why you may not be actually working on any particular aspect of it. You could be monitoring it. You're an attendee because you're qualified. Why didn't you present any evidence that these attendees actually shared the document? Well, I don't think that's required. Even if it's not, I mean, that seemed to have been something that would have been pretty easy for you to obtain even among your own personnel. Well, why didn't you present that? I suppose that would have been only for our personnel. And then the subject of the disagreement that that doesn't show broader dissemination to the public. And you never do have to show actual subsequent access. So I think if, if it's understood, these are public documents and they were free to disseminate them and they represent virtually the entirety of industry and academy, then this is in the public domain and it would be untoward. Where do you draw? Are you saying there is now no line to be drawn? Or is there a point at which people can collaborate in confidence? They can. They have to do it in confidence. And that's what they did not do here. I'm sorry? And keep off the internet. They can keep it off the internet or they can encrypt it or keep it in a private communication. Or not communicate by way of anything which could be accessed? I think that the court always has looked to whether or not there's either a confidentiality restriction, an expectation of confidentiality, or to the contrary, is there a purpose of making it public? And that's what we have here. That's what distinguishes this. Well, you wouldn't, you wouldn't go so far as to say that just because, you know, Russia or China could hack something that that was enough. No, it has, there has to be no expectation or restriction on confidentiality. And so, and the fact that these are corporate representatives, for the most part, these meetings or representatives of research institutions. When you say restrictions on confidentiality, it's, I mean, I communicate with my colleagues all the time and I don't tell them this is confidential, but I, but I have no doubt that it's being kept as a confidential matter. That's the Cordes case, Your Honor. Even though there was a, in there, in that case, the researcher had actually contacted commercial companies and there was no express confidentiality restriction, but there was an expectation of confidentiality. And the court said that's not a printed publication. Here, the very purpose of this enterprise is to, is to have public dissemination. And I think that is necessary. Was there evidence of that fact other than attorney argument? That that was the purpose of the enterprise? Oh, yes, the, that's what the terms of reference say, that this is, well, first of all, yes, that there is discussion of why the JCT was formed. There's an article in that, appendix 1903, but also the terms of reference and the IUT websites that discuss the JCT. The purpose of this was to develop a standard to replace the existing standard. And so that you have a new standard to which all the industry will comply. So there would be no reason to keep working drafts of the standard confidential. And that's why every idea which is expressed, which goes into the minutes and into the record becomes published prior art. Well, yes, because it's, if it's somebody's idea, even though nothing else happens and Exactly, because they established this as a policy that all documents would be public, including the input document. Anything that's written down becomes a document. Well, that's, that's, that's interesting. Well, I think quite a dramatic change. Perhaps it, perhaps it's now required by advances in technology. The board didn't think so. So we'll have to figure it out. I don't think there has to be a broad rule. I think in the context of the standard setting organization, which is designed to create the next standard, the next generation standard for video coding. I think that that is appropriate. And everyone else can preserve confidentiality, except the standard creating organization. Is that right? I think you can, you can create confidentiality expectations or restrict and express restrictions. And then this wouldn't be a printed publication if you're in collaboration. And it may be that many forms of sort of, you know, groups of scientists working collaboratively on a research project, they may have an expectation of confidentiality, even if it's not expressed. But here, there's an express policy of publication of the documents. All the attendees received it with no restriction or expectation. They were free to distribute it throughout their organizations, throughout Samsung, LG, Apple. Everybody could get these documents, or they could find it with the exercise of reasonable diligence, either to get documents from their representatives, or to go on to the website that was universally open. And as a last point on the website, I would like to point out, I think the board created an error in only looking at the accessibility of the website to members outside of JCT and MPEG. Now, MPEG is different. It's the parent organization. It's not actually directly formulating the standard, but it will oversee the operation and eventually approve it. And those folks and the JCT folks, their meetings are co-located. They know the standardization process. Those folks would be able to find that document on, even under a website that is organized by meeting. So you can't exclude a huge swath of the relevant public, all these representatives of institutions and companies. And I think it would be untoward if one could recapture as private property a proposed industry standard that has been shared with the leadership of industry. But you are proposing the end of the standard setting organization because people will no longer be able to speak freely to each other. No. What I'm saying is if the standard says any of the documents that are generated by this process are public, and they will be on a public website. So that was what the terms of reference said. So they are free. Standard setting organizations, if they found it necessary, could create confidentiality restrictions. Don't write anything down. And don't record it. Well, there's no reason to keep confidentiality in a standard organization because you want to have the buy-in of the whole organization. You don't want your own idea, which is nascent and undeveloped, and might take you five or more years to get into a patent application to be a reference against you. But there it sits, in the air of the standard setting organization. Well, the person has a choice to submit or not to submit. If you submit it to... You end the freedom of exchange. Perhaps that's inevitable. This board, I think, was trying to not take such a giant step. Well, I think we'll have to take it under consideration. Do you have any more questions, any more comments? Thank you both. The case is taken under submission. That concludes our arguments for this morning.